IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| XL SPECIALTY INSURANCE | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:14cv1058(JCC/JFA) |
| | ) | |
| ROBERT W. TRULAND, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on the parties' cross-
motions for summary judgment.  Plaintiffs XL Specialty Insurance
Co., XL Reinsurance America, Inc., and Greenwich Insurance Co.'s
(collectively "Plaintiffs" or "XL") have moved for summary
judgment on Counts I through III of the Amended Complaint.
(Pls.' Mot. for Summ. J. [Dkt. 151].)  Robert Truland has moved
for "partial" summary judgment on the fraud and fraudulent
conveyance counts and also asks the Court to find that his
retirement accounts are exempt from his indemnity obligations,
as well as moving for summary judgment on the fraud and
fraudulent conveyance counts.  (R. Truland's Mot. for Summ. J.
[Dkt. 158].)  Mary Truland moves for summary judgment on all
counts.  (M. Truland's Mot. for Summ. J. [Dkt. 160].)  For the
following reasons, the Court will (1) grant Plaintiffs' Motion

1

for Summary Judgment; (2) deny Robert Truland's Motion for Summary Judgment as to his retirement accounts and Count IX; (3) grant Robert and Mary Truland's Motions for Summary Judgment as to Counts IV, V, VI, and VII; and (4) deny Mary Truland's Motion for Summary Judgment as to Counts I, II, III, and IX.[1]  Thus, the sole issue remaining for trial is whether Robert Truland fraudulently conveyed an interest in Truland Partners to an irrevocable family trust in order to put the interest beyond the reach of Plaintiffs.

## I. Background

### A. Factual Background

Plaintiffs underwrite construction surety bonds. (Pls.' Mem. in Supp. [Dkt. 152] at 2.)[2]  In July 2011, the Truland Entities, through their broker Thomas Rutherfoord ("Rutherfoord") sought to establish a surety relationship with Plaintiffs to support an expansion of their business. (*Id.* at 4.)  In underwriting the request for bonds, Plaintiffs required personal indemnity from Robert Truland ("Dr. Truland"), the president of Truland Entities, in the event of a loss on any bond. (*Id.* at 4, 9.)  As part of the underwriting process,

---

[1] In resolving these motions, the Court will deny Plaintiffs' motion in limine [Dkt. 155] and Robert Truland's Motion in Limine [Dkt. 187] as moot.

[2] Though the citations in Section I are to Plaintiffs' Memorandum in Support, all parties have admitted the facts as stated in this Memorandum Opinion.

Plaintiffs requested a financial statement from Dr. Truland and his wife, Mary ("Mrs. Truland").  (*Id.* at 4.)

On July 26, 2011 Dr. and Mrs. Truland each signed an Indemnity Agreement ("Indemnity Agreement") with Plaintiffs. (*Id.* at 9.)  The Trulands read and initialed each page of the Indemnity Agreement.  (*Id.* at 9.)[3]

### B. Relevant Provisions of the Indemnity Agreement

Section II(E) of the Indemnity Agreement states that "this ***AGREEMENT***[4] shall be liberally construed so as to protect, exonerate, hold harmless and indemnify to the fullest extent ***SURETY***."  (Pls.' Mem. in Supp. at 9.)  It provides that it "binds ***UNDERSIGNED***, jointly and severally, to ***SURETY*** in connection with each and every obligation of this ***AGREEMENT***, including, but not limited to, Section V of this ***AGREEMENT*.**"  (*Id.* at 9.)    "Undersigned" are defined as "***PERSON(S)*** who execute this ***AGREEMENT***."  (*Id.* at 9.)

Section V(A) contains a key feature of the Indemnity Agreement, the obligation of the undersigned

> to exonerate, hold harmless, indemnify, and keep indemnified SURETY from and against any and all losses, claims, liabilities, damages, demands for payment or performance, expenses and costs of whatever kind or nature including, but not limited to,

---

[3] Dr. Truland also signed the Indemnity Agreement on behalf of the Truland Entities in his capacity as president. (Pls.' Mem. in Supp. at 9.)
[4] Emphasis appears in original.

> interest, court costs, document reproduction and storage charges, investigative expenses and costs, adjusting, expert and attorney fees imposed upon, made, sustained or incurred by *SURETY* by reason of: (1) *SURETY* having executed, provided or procured *BONDS* on behalf of *PRINCIPAL*; (2) the *UNDERSIGNED'S* failure to perform or comply with any of the provisions of this *AGREEMENT*; (3) *SURETY* enforcing any of the covenants or conditions of this *AGREEMENT*; (4) *SURETY* conducting any investigation, obtaining or attempting to obtain a release, or recovering or attempting to recover loss or unpaid premium in connection with any *BONDS(S)*; **and/or (5)** *SURETY* prosecuting or defending any action or claim in connection with any *BONDS* executed, provided or procured on behalf of *PRINCIPAL*.

(*Id.* at 10.)

In order to meet this obligation, "*UNDERSIGNED* shall, upon demand of *SURETY* deposit funds or other collateral with *SURETY*; such funds shall be, at the *SURETY'S* option, money or property or liens on or security interests in property." (Daily Aff. [Dkt. 153], Ex. A, at 4.)  The amount of collateral shall be, at Plaintiffs' option, either "the sum of all pending claims asserted against *SURETY* on *BOND(S)*, whether such claims are contested or not or whether or not liability has been established with respect to such claims, plus the amount of costs and expenses which the *SURETY*, in its sole discretion, estimates may be incurred as a result of the assertion of such claims" or " the reserve established by *SURETY* as a consequence of having issued *BOND(S)* on behalf of *PRINCIPAL* whether on

4

account of an actual liability or one which is, or may be, asserted against *SURETY* and whether or not any payment for such loss has been made." (*Id.* at 4.)

Regarding claims, demands, suits, or judgments against the bonds, Section VI(A) provides that Plaintiffs

> shall have the right in [their] sole discretion to determine whether any claims, demands, suits or judgments on or against *BOND(S)* provided, procured or executed by *SURETY* shall be paid, compromised, defended, prosecuted or appealed irrespective of the fact that *UNDERSIGNED* may have assumed, or offered to assume, the defense of the *SURETY* upon such claim, demand, suit or judgment.

(*Id.* at 5.)  Liability to the undersigned extends to all amounts paid by the surety "in good faith" under the belief that

> (1) *SURETY* is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; or (2) such payments were necessary or advisable to protect any of the *SURETY'S* rights or to avoid or lessen *SURETY'S* liability or alleged liability.

(*Id.* at 5.)  "Good faith" is defined in Section I of the Indemnity Agreement as "[h]onest motives regardless of whether such motives are the product of bad judgment or negligence." (*Id.* at 3.)  "The voucher(s) or other evidence of such payment(s) or an itemized statement of payment(s) sworn by an officer of *SURETY* shall be prima facie evidence of the fact and

5

the extent of the liability of **UNDERSIGNED** to **SURETY**." (*Id.* at 5.)

Dr. and Mrs. Truland's indemnity obligations were originally limited to ten million dollars. (*Id.* at 12.) Mrs. Truland's obligation to indemnify "shall only extend to and be enforceable against those assets jointly held by the Individual Indemnitors, and to any and all property she has received or may hereafter receive from Robert Truland and shall not extend and be enforceable against her sole and separate estate." (*Id.* at 12.) Additionally, Dr. and Mrs. Truland's indemnity obligations "shall not extend to and be enforceable against the home of the Individual Indemnitors located at 15800 Darnestown Rd., Germantown, Va. [sic] 20874." (*Id.* at 12.)

Section XXI[5] is titled "Financial Reporting and Warranty of Financial Information." (*Id.* at 11.) The section describes undersigned's responsibility to "deliver to the **SURETY** within one hundred and twenty days (120 days) of the end of the fiscal year of the **UNDERSIGNED** (i) the consolidated and consolidating balance sheet of the **UNDERSIGNED** as of the end of the fiscal year of the **UNDERSIGNED** and (ii) the related consolidated and consolidating statements of income and surplus and cash flows for such year . . . with (iii) the opinion of a

---

[5] The Trulands contend that this section does not apply to them, though they do not dispute that it is contained in the Indemnity Agreement that they signed.

nationally recognized independent public accountants [sic][.]"

(*Id.* at 11.)  Subsection (D) of this section contains the

following representation regarding accuracy of the financial

statements:

> The ***UNDERSIGNED*** hereby warrant the accuracy
> of all financial statements submitted to the
> ***SURETY*** and covenants and agrees that the
> assets described therein are dedicated to
> and imposed with a trust for the purposes of
> this ***AGREEMENT***.

(Pls.' Mem. in Supp. at 11.)  The term "undersigned" is defined

as "***PERSON(S)*** who execute this ***AGREEMENT***[.]"  (Daily Aff., Ex.

A, at 3.)

Finally, under Section XXII(B), "[t]he ***UNDERSIGNED*** has

all necessary corporate or other power, authority or legal right

to execute, deliver and perform ***UNDERSIGNED'S*** obligations under

this ***AGREEMENT***."  (Pls.' Mem. in Supp. at 11.)  According to the

preamble of that section, Plaintiffs "shall be entitled to rely

upon the truth, accuracy, and completeness" of this

representation "without regard to any other information that may

be now or hereafter known by or disclosed" to Plaintiffs.  (*Id.*

at 11.)

The parties executed two amendments to the Indemnity

Agreement.  Only the second amendment is relevant here.[6]  That

---

[6] The first amendment, on February 2, 2012, added another
corporate indemnitor to the agreement.  (Pls.' Mem. in Supp. at
12.)

amendment, executed on February 21, 2013, removes the ten million dollar cap on the Trulands' indemnity obligation for bonds issued after January 18, 2013, which means that the Trulands' liability is uncapped. (*Id.* at 12.)

### C. Procedural History

Following the execution of the Indemnity Agreement, Plaintiffs issued numerous payment, performance, and commercial surety bonds on behalf of the Truland Entities. (Pls.' Mem. in Supp. at 12.)  At some point in 2013 or 2014,[7] the Truland Entities experienced significant financial difficulties. (*Id.* at 12.)  On July 21, 2014, the Truland Entities ceased operations on all bonded projects, and two days later it filed for bankruptcy. (*Id.* at 13.)  As of that date, July 23, 2014, the Truland Entities were in default on all active, bonded projects. (*Id.*)  As a result of the default and bankruptcy, Plaintiffs have received demands on the performance and payment bonds. (*Id.* at 13.)  Through counsel, Plaintiffs sent a demand letter to the Trulands on July 25, 2014, seeking indemnity regarding losses as of that date, a deposit of collateral in the amount of Plaintiffs' initial reserve, and access to the Trulands' books and records. (*Id.* at 16.)  When the Trulands

---

[7] The parties disagree as to whether the Truland Entities' financial difficulties began in 2013 or 2014.  The Court does not find it necessary for present purposes to resolve when the difficulties began.

failed to comply with those demands, Plaintiff initiated this suit, naming A&E Technologies, Inc. ("A&E Technologies"), the sole non-bankrupt holding of Truland Entities, and the Trulands as defendants.

Plaintiffs moved for a temporary restraining order ("TRO"), which was granted in part.[8]  (See 8/21/14 Mem. Op. & Order [Dkts. 11-12, 22].)  The parties were able to reach an agreement on the terms of a preliminary injunction.  (See 12/19/14 Consent Order [Dkt. 87].)  With leave of Court, Plaintiffs filed an Amended Complaint on January 6, 2015. (1/5/15 Order [Dkt. 93]; Am. Compl. [Dkt. 94].)  The Amended Complaint, the operative pleading here, asserts nine causes of action: breach of contract (money damages) ("Count I"); breach of contract (specific performance) ("Count II"); *quia timet* and injunctive relief ("Count III"); fraud/misrepresentation in the inducement ("Count IV"); constructive fraud in the inducement ("Count V"); fraud/misrepresentation in the inducement of continued bonding relationship ("Count VI"); constructive fraud/misrepresentation in the inducement of continued bonding

---

[8] Under the TRO, the Trulands were prohibited from selling or transferring any assets that could be pledged as collateral but could sell assets for fair market value, assuming that Plaintiffs did not object, and deposit the funds in escrow. Additionally, the Trulands had to immediately furnish continuing and complete access to their books and records, a complete accounting of all assets presently held, and a complete accounting of all assets pledged to Plaintiffs and/or held in trust under the Indemnity Agreement.  (9/23/14 Order [Dkt. 22].)

relationship ("Count VII"); fraudulent/voluntary conveyance in violation of Virginia law ("Count IX")[9]; and breach of fiduciary duty ("Count X").  (Am. Compl. at 27-48.)

As noted earlier, all parties have moved for summary judgment.  Having been fully briefed and argued, this motion is ripe for disposition.

## II. Legal Standard

Summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party always bears the initial burden of "informing the district court of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex,* 477 U.S. at 323.  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *see also Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.,* 673 F.3d 294, 299 (4th Cir. 2012) (stating the opposing party must "come forward with specific facts showing

---

[9] The Court dismissed Count VIII, fraudulent/voluntary conveyance in violation of the Maryland Uniform Fraudulent Conveyance Act, because Virginia law controls this litigation.  (3/3/15 Mem. Op. and Order [Dkts. 143 and 144].)

that there is a genuine issue for trial.").  Importantly, the
non-moving party must show more than some metaphysical doubt as
to the material facts.  "[T]he non-moving party 'may not rest
upon mere allegation or denials of his pleading, but must set
forth specific facts showing that there is a genuine issue for
trial.'"  *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir. 1995)
(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256
(1986)).

     In reviewing the record on summary judgment, the Court
"must draw any inferences in the light most favorable to the
non-movant" and "determine whether the record taken as a whole
could lead a reasonable trier of fact to find for the non-
movant."  *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253,
1259 (4th Cir. 1991) (citations omitted).  "[A]t the summary
judgment stage the judge's function is not himself to weigh the
evidence and determine the truth of the matter but to determine
whether there is a genuine issue for trial."  *Anderson,* 477 U.S.
at 249.  Where there is conflicting evidence, the court must
credit the evidence of both sides and acknowledge that there is
a genuine issue of material fact that cannot be resolved by
summary judgment.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1868-69
(2014) (stating that summary judgment is inappropriate where
each side has put forward competent evidence that raises a
dispute about a material fact).

### III. Analysis

**A. Contract Claims (Counts I, II, and III) against the Trulands**

The first three counts of the Amended Complaint arise from the Trulands' alleged breach of contract.  In moving for summary judgment on these claims,[10] Plaintiffs seek the following relief: (a) the Trulands are jointly and severally liable to Plaintiffs under the Indemnity Agreement for $16,083,280.69 of Plaintiffs' total net loss as of February 6, 2015; (b) the Trulands are contractually required to reimburse Plaintiffs for attorneys' fees, expert fees, investigative costs and expenses as stated in Section V of the Indemnity Agreement, including, but not limited to, fees, costs, and expenses in this action, in the bankruptcy action against the Truland Entities, and in any action related to bonds issued for the Truland Entities; (c) the Trulands are contractually liable for interest from the date of Plaintiffs' payments at the statutory rate of six percent per annum; (d) Plaintiffs may satisfy Dr. Truland's indemnity obligation from all of his assets, including, but not limited to, all individual and joint assets in the Revised 2011 financial statement, except for his interest in the Trulands' home located at 15800 Darnestown Road, Germantown, Maryland; and

---

[10] The Court interprets Plaintiffs as moving for relief on these three claims only, not the remaining six counts related to fraud in the inducement and fraudulent conveyance. (*See*  Pls.' Mot. & Ex. 7, Proposed Order.)

(e) Plaintiffs may satisfy Mrs. Truland's indemnity obligation from her interests in the joint assets on the Revised 2011 financial statement (except for her interest in the Trulands' home at 15800 Darnestown Road, Germantown, Maryland) as well as any assets she received from Mr. Truland.[11] (Pls. Mot. [Dkt. 151] at 1-3.)

### 1. Breach of the Indemnity Obligation and Damages

The applicable Virginia contract law principles are well-settled. Unambiguous contractual terms are given their plain meaning. *See Pysell v. Keck,* 559 S.E.2d 677, 678 (Va. 2002) (stating familiar rule of contract interpretation that courts must apply the plain meaning of unambiguous contract terms). When there is an express indemnity agreement between a surety and a subcontractor, the "surety is entitled to stand upon the letter of his contract." *Fid. & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir.1983). The governing Indemnity Agreement provisions are clear and unambiguous and must therefore be applied in accordance with their plain meaning. *See Bell BCI Co. v. Old Dominion Demolition Corp.*, 294 F. Supp. 2d 807, 812 (E.D. Va. 2003) (stating the same).

---

[11] Plaintiffs also seek a judgment that A&E Technologies is jointly and severally liable to Plaintiffs under the Indemnity Agreement for $22,574,152.82 of Plaintiffs' total net loss as of February 6, 2015. The Court addresses A&E Technologies in Section III.D, *infra*.

The elements of a breach of contract action in Virginia are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).  Though the parties would have the Court believe otherwise, this case is quite simple.  It is undisputed that Plaintiffs and the Trulands entered into an contract, whereby the Trulands promised to be personally liable to Plaintiffs should demands be made on the bonds in exchange for Plaintiffs agreeing to issue payment and performance bonds for the Truland Entities.  This created a legally enforceable obligation that the Trulands owe to Plaintiffs and that the Plaintiffs owe to Trulands.  Neither party disputes that demands were made on the bonds.  This triggered both parties' obligations.  Plaintiffs had an obligation to make payments on those demands, and the Trulands had an obligation to post collateral in an amount determined by Plaintiffs and to indemnify Plaintiffs. Plaintiffs have fulfilled their obligation to pay claims on the bonds.  The Trulands have not fulfilled their obligation, failing to post collateral until this litigation and contesting their indemnity obligation.  This is a breach of the Indemnity Agreement, specifically the provision requiring the Trulands to post collateral once a demand was made by the Plaintiffs

14

(Section V(B)) and to indemnify Plaintiffs (Section V(A)).
Finally, the Trulands' failure to perform their legally
enforceable obligation has resulted in damages to Plaintiffs.
Plainly, the elements of a breach of contract have been met in
this case.

        The only issue that needs to be resolved with respect
to Plaintiffs' contract claim is the measure of damages.  Under
Section VI of the Indemnity Agreement, Plaintiffs have the
right, in their sole discretion, to determine what claims,
demands, suits, or judgments should be paid.  (Daily Aff., Ex.
A, at 5.)  Vouchers or other evidence of payment sworn to by an
officer of Plaintiffs are *prima facie* evidence of the extent of
the Trulands' liability to Plaintiffs.  (*Id.*)  Mrs. Truland
argues that summary judgment is inappropriate because Plaintiffs
have not proffered an expert to value her sole and separate
estate and therefore the measure of damages is uncertain.  (M.
Truland's Mem. in Supp. [Dkt. 162] at 6.)  This is incorrect.
The measure of damages here is not the value of the assets the
Trulands agreed to pledge.  Rather, per the terms of the
Indemnity Agreement, damages are determined by the amount of
money Plaintiffs have expended resolving bond claims.

        In support of their motion for summary judgment,
Plaintiffs have submitted the affidavit of Greg Daily, vice
president, head of North America XL Surety Claims, and

15

supporting documentation of computer-generated payment reports, copies of checks and wire transfer receipts, and summaries of such payments of demands on the bonds. (*See* Pls.' Mem. in Supp. at 22; Greg Daily Aff., Ex. A-Z.) According to Daily, as of February 6, 2015 Plaintiffs have received 209 bond claims and paid $38,169,724.65 toward resolving payment bond claims and completing bonded projects, including legal and consulting fees. (Daily Aff. ¶¶ 26-27.) At the motion hearing, counsel for both Robert and Mary Truland stipulated that the figures represented in Daily's affidavit were accurate.

Exhibit U to Daily's affidavit is a spreadsheet prepared by him documenting Plaintiffs' net bond losses. The spreadsheet is broken down into two parts: bonds executed between the original Indemnity Agreement and the Second Amendment to that agreement, at which time the Trulands' liability was capped at $10 million (hereinafter "Group A bonds"), and bonds issued after the Second Amendment, in which there was no cap on the Trulands' liability (hereinafter "Group B bonds"). Plaintiffs paid $30,113,532.65 in both bond payments and legal and consulting fees on Group A bonds. (Daily Aff., Ex. U, at 1.) Plaintiffs received $11,492,950.56 in contract monies from jobs secured by the bonds that they credited to the Trulands. (*Id.*) This yields a net loss on Group A bonds of $18,620,582.09. (Daily Aff. ¶ 48.) As the Trulands are only

16

personally liable up to $10 million, Plaintiffs seek to recover the full $10 million from the Trulands on Group A Bonds. (*Id.*)

Plaintiffs paid $8,056,192.00 in both bond payments and legal and consulting fees from Group B bonds. (Daily Aff., Ex. U, at 2.)  They received $1,972,911.31 in contract monies from jobs secured by Group B bonds. (*Id.*)  This yields a net loss on Group B bonds of $6,083,280.69. (*Id.*)  Since Group B bonds were executed after the limitation on liability was removed, the Trulands are personally responsible for all $6,083,280.69 in losses on Group B bonds. (Daily Aff. ¶ 48.) In total, therefore, Plaintiffs have established their prima facie case that the Trulands are personally liable to indemnify Plaintiffs in the amount of $16,083,280.69.

The $16,083,280.69 does not include unpaid bond premiums. (Daily Aff. ¶ 48.)  In addition to the indemnification for demands on the bond, the Indemnity Agreement states that the "**UNDERSIGNED** shall pay or cause to be paid to **SURETY**, in such manner and at such time as required by **SURETY**, all premiums and charges of **SURETY** . . . for executing, providing or procuring **BOND(S)** for **PRINCIPAL."** (Daily Aff., Ex. A, at 4.)  As noted earlier, "undersigned' are "**PERSON(S)** who execute this **AGREEMENT**." (Daily Aff., Ex. A, at 3.)  The Trulands both signed the Indemnity Agreement.  There is still $9,083.25 in outstanding bond premiums that need to be paid.

17

(Daily Aff. ¶ 42.)   As the Trulands executed the Indemnity Agreement, they are liable for the unpaid bond premiums. Therefore, the Trulands are personally liable to Plaintiffs in the amount of $16,092,363.94.

The Trulands raise three challenges to the dollar figure calculated by Plaintiffs.   First, in attempting to overcome Plaintiffs' *prima facie* evidence, they state that they "cannot dispute" the figures reached by Plaintiffs because such calculations are "solely within XL's possession."   (M. Truland's Opp. [Dkt. 182] at 21.)[12]  Under both the Federal Rules of Civil Procedure and this Court's Local Rules, the nonmoving party "must support [its] assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A); *see also* E.D. Va. Local Rule 56(B) ("A brief in response to [a motion for summary judgment] shall include a specifically caption section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated *and citing parts of the record*

---

[12] Dr. Truland raises the same arguments, but for ease of citation the Court refers only to Mary Truland's opposition.

18

*relied upon to support the facts alleged to be in dispute*.")
(emphasis added).

The Court is not persuaded by the Trulands' claim that
they cannot meaningfully challenge Plaintiffs' figures because
they lack the right information.  One of the purposes of
discovery is to "ascertain[] the facts, or information as to the
existence or whereabouts of facts[.]"  *Hickman v. Taylor*, 329
U.S. 495, 500 (1947) (citation omitted).  "[The discovery rules]
make a trial less a game of blind man's bluff and more a fair
contest with the basic issues and facts disclosed to the fullest
practicable extent."  *United States v. Proctor & Gamble Co.*,
677, 682-83 (1958).  Here, discovery was set to close on January
9, 2015.  [Dkt. 29.]  However, after consideration of the
parties' joint discovery plan, the magistrate judge extended
discovery to February 13, 2015.  [Dkt. 51.]  The parties jointly
moved to extend discovery again, [Dkt. 104], which the
magistrate judge denied [Dkt. 119].  The Trulands had ample time
to conduct discovery and learn more about these figures, but
apparently chose not to do so.[13]

---

[13] The Court notes that this is not a situation governed by
Federal Rule of Civil Procedure 56(d), which applies when "a
non-movant shows by affidavit or declaration that, for specified
reasons, it cannot present facts essential to justify its
opposition[.]"  First, the Trulands have produced no such
affidavit.  Second, the Trulands have had more than enough time
to undertake sufficient investigation.  At the August 21, 2014
TRO hearing, at which both Plaintiffs and Robert Truland's

Quite simply, it is not enough at this point for the Trulands to state that they do not have the information required to dispute the facts.  Under both the Federal Rules and the Local Rules, stating that Plaintiffs' undisputed facts are beyond the Trulands' ability to dispute is the same as admitting Plaintiffs' facts are true.  *See* Fed. R. Civ. P. 56(e)(2)-(3) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it[.]"); E.D. Va. Local Rule 56(B) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").  The Trulands have failed to controvert any of the dollar amounts calculated by Plaintiffs. Therefore, the Court deems those figures admitted as the measure of the Trulands' liability.

---

counsel were present, the Court directed the parties to confer on discovery.  [Dkt. 10.]  Discovery commenced on October 1, 2014.  [Dkt. 29.]  Therefore, the remedies available under Rule 56(d) do not apply here.

Second, the Trulands argue that the Indemnity
Agreement is a security agreement and that Plaintiffs are
secured parties under the Virginia Uniform Commercial Code
("UCC").  (M. Truland's Mem. in Supp. at 24.)  The Trulands
assert that the dispute over the scope of the Indemnity
Agreement precludes summary judgment.  (*Id.*)  "'[C]ontract
interpretation is a subject particularly suited for summary
judgment disposal.'"  *Bala v. Commonwealth of Va. Dept. of
Conservation & Recreation*, No. 3:12CV748-HEH, 2014 WL 1281235,
at *2 (E.D. Va. Mar. 27, 2014) (quoting *Bank of Montreal v.
Signet Bank*, 193 F.3d 818, 835 (4th Cir. 1999)).  "'Only an
unambiguous writing justifies summary judgment without resort to
extrinsic evidence, and no writing is unambiguous if susceptible
to two reasonable interpretations.'"  *Id.* (quoting *Goodman v.
Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993)).

The contract language at issue here is unambiguous.
Section XII states "[t]his ***AGREEMENT*** shall constitute a security
agreement and financing statement for the benefit of the ***SURETY***
in accordance with the provisions of the Uniform Commercial Code
or any other statute and may be so used by the ***SURETY*** without in
any way abrogating, restricting, or limiting the rights of the
***SURETY*** under this ***AGREEMENT*** or as provided by law or equity."
(Daily Aff., Ex. A, at 7.)  Section XII's plain language
allowing the Indemnity Agreement to qualify as a security

21

agreement and financing statement under Article 9 of the UCC do not, without more, bring the entire contract within the ambit of the UCC. *See General Ins. Co. of Am. v. Mezzacappa Bros., Inc.*, No. 01-CV-7394, 2003 WL 22244964, at *5 (E.D.N.Y. Oct. 1, 2003) (rejecting that such contractual language automatically brings the contract under the UCC). All Section XII does is alert the parties that the Indemnity Agreement is a security agreement and financing statement under Article 9 of the UCC. It does not state, nor can it be interpreted as such, that the terms of the Indemnity Agreement are subject to the UCC.

Finally, the Trulands challenge whether the dollar figures are "reasonable" and state that it is a jury question as to whether Plaintiffs made payments on the bond in good faith. In support, they point to the report of James F. Morelewicz ("Morelewicz"). (M. Truland's Opp., Ex. R.) In a separate motion, Plaintiffs have moved to exclude Morelewicz's report. (*See* Pls.' Mot. in Limine [Dkt. 155].)

As noted earlier, the Indemnity Agreement allows Plaintiffs to make payments in the "good faith" belief that they were liable or payments were necessary to protect themselves from liability. (Daily Aff., Ex. A, at 5.) The Indemnity Agreement provides the definition of good faith: "[h]onest motives regardless of whether such motives are the product of bad judgment or negligence." (*Id.* at 3.) Good-faith payment

22

clauses like the one here have routinely been upheld by courts,

subject to the exception of a payment made fraudulently or in

bad faith.  *Bristol Steel*, 722 F.2d at 1164 (collecting cases).[14]

Thus, in order for the Trulands to defeat summary

judgment, they have to point to a specific part of the record

showing that Plaintiffs acted with a dishonest motive or for a

fraudulent purpose.  The Trulands have failed to meet this

burden.  Though they offer Morelewicz's report, which generally

alleges that Plaintiffs should have handled the bond payment

claims better, the report does not address whether there was

fraud or bad faith in making the bond payments.  Morelewicz's

report states his belief that Plaintiffs did not mitigate

damages.  (Pls.' Mot. in Limine [Dkt. 155], Ex. B., at 13.)  But

---

[14] Though neither party has cited to it, the case of *Bd. of Supervisors of Fairfax Cnty. v. Culbertson Constr. Co.* is distinguishable.  The Circuit Court of Fairfax County considered a nearly identical good-faith payment language in a construction suretyship contract.  No. 69951, 1987 WL 488767, at *1 (Va. Cir. Ct. Nov. 17, 1987).  Noting that there was no Virginia case on point, the court discussed the majority view upholding such provisions.  *Id.* at *2-3.  Yet for public policy reasons, it appeared to craft a standard that required a surety to undertake reasonable investigation of claims, even in the face of express contractual language that did not require one, before it was entitled to indemnification.  *Id.* at 4.  Ultimately, however, the court held that the surety did not perform work outside the contract and was entitled to indemnification, even without prior investigation.  *Id.* at 5.  Therefore, the court's discussion about public policy considerations suggesting that a principal should not be liable for a surety's negligence is dicta.  *See Lone Mountain Processing, Inc. v. Bowser-Morner, Inc.*, No. Civ. A. 2:00CV000093, 2005 WL 1894957, at *8 (W.D. Va. Aug. 10, 2005) (interpreting *Culbertson* as upholding an agreement absolving a surety from its own negligence).

23

Morelewicz admits that he does give any opinion as to Plaintiffs' motivation in making payments on bond claims. (*Id.* at 9-13.)[15]  Therefore, the report standing alone does not show that Plaintiffs acted in bad faith or for fraudulent purposes in making payments on the bonds.

Nor does the Court find the report instructive on the ultimate legal determination of whether Plaintiffs acted in good faith as defined by the Indemnity Agreement.  Morelewicz's conclusion is that Plaintiffs did not "meet the usual and customary industry standards of good surety claim decisions and handling." (M. Truland's Mem. in Supp., Ex. R, at 17.)  That conclusion and Morelewicz's analysis do not help the Court in determining whether there was bad faith or fraud in making payments on bond claims.  While it may be that Plaintiffs were,

---

[15] The relevant portion of Morelewicz's deposition testimony is as follows:

> Q: So you haven't given an opinion whether XL acted in good faith; right?
> A: That's not my place to do.  That's the Court's place to do that.
> Q: You have not given any opinion whether XL acted with honest motives in any of the actions that it took related to this litigation; right?
> A: I did not address honest motives, that is correct.
> Q: You certainly have not opined that XL acted in bad faith with regard to any of the actions that it took relating to this Truland matter?
> A: That is correct.

(Pls.' Mot. in Limine, Ex. B., at 7.)

in fact, negligent in handling bond claims on the Truland
Entities' projects, the explicit contractual language agreed to
by all parties says that negligence is irrelevant.  Morelewicz's
report detailing Plaintiffs' alleged negligence is therefore
also irrelevant.

          Morelewicz's report is the only evidence the Trulands
put forward to attack how Plaintiffs handled the payments on
bond claims.   Therefore, there is no jury question as to
whether these payments were made in good faith, and summary
judgment is appropriately awarded to Plaintiffs in the
aforementioned amount.  *See Hanover Ins. Co. v. N. Bldg. Co.*,
751 F.3d 788, 795 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 280
(2014,) *reh'g denied*, 135 S. Ct. 747 (2014) (stating the
nonmoving party "had to come forward with more than just an
ethereal suspicion that the number was too high.").  Because
summary judgment for Plaintiffs is appropriate, Plaintiffs'
motion in limine to exclude Morelewicz's report at trial will be
denied as moot.

          Plaintiffs also request prejudgment interest.  Here,
Virginia law controls.  *See Hitachi Credit Am. Corp. v. Signet
Bank*, 166 F.3d 614, 633 (4th Cir. 1999) (stating state law
governs award of prejudgment interest in a diversity case).
With regard to such an award, the Virginia Code provides in
pertinent part that "[i]n any action at law or suit in equity,

25

the final order, verdict of the jury, or if no jury the judgment
or decree of the court, may provide for interest on any
principal sum awarded, or any part thereof, and fix the period
at which the interest shall commence." Va. Code Ann. § 8.01-
382.  Whether prejudgment interest should be awarded under §
8.01-382 is a matter within the sound discretion of the district
court. *Hitachi*, 166 F.3d at 633.  The statutory rate of
interest in Virginia is six percent. Va. Code Ann. § 6.2-
302(A).  Under the Indemnity Agreement, Plaintiffs are entitled
to "interest from the date of ***SURETY'S*** payment at the maximum
rate permitted in the jurisdiction in which this ***AGREEMENT*** is
enforced, or is enforceable." (Daily Aff., Ex. A, at 5.)
However, Plaintiffs have not provided any meaningful way for the
Court to calculate interest from date of payment.  Therefore,
the Court calculates prejudgment interest in this case from the
date the suit was filed – August 20, 2014 – to the date of
judgment.  Thus, Plaintiffs are entitled to $698,364.48 in
interest, bringing the Trulands' total liability to
$16,790,728.42.

### 2. Assets that Can Satisfy the Judgment

There is dispute among the parties as to which assets
may be pledged to satisfy the Trulands' indemnity obligations.
The dispute centers on the purported "2011 Revised Financial
Statement."  Under the terms of the Indemnity Agreement, Dr.

26

Truland agreed to pledge all of his assets, except the home at
15800 Darnestown Road, and Mary Truland agreed to pledge assets
held jointly with Dr. Truland, excluding the home at 15800
Darnestown Road.  Additionally, Mrs. Truland's "sole and
separate estate" is not subject to the indemnity obligation.
Thus, regardless of the outcome of the fraud counts, the Court
must address the Trulands' affirmative defenses and resolve what
assets may be used to satisfy the judgment here.  Therefore, the
Court will address whether the Trulands must pledge the
following assets in dispute: (a) Dr. Truland's retirement
accounts; (b) Mrs. Truland's interests in Belgarde, Truland
Partners, and Truland Holdings; (c) the scope of the marital
home exemption; and (d) Park Potomac Investors 1 and 2.

### a. Dr. Truland's retirement accounts

Dr. Truland maintains that his 401(k) and 408(b) plans
cannot be pledged or used to satisfy the indemnity obligation.
(R. Truland's Mem. in Supp. of Summ. J. [Dkt. 159] at 9-14.)
The question is whether Dr. Truland effectuated a pledge of his
retirement accounts when he signed the Indemnity Agreement and
subsequent amendments, and, if so, whether such a pledge was
valid.

The original Indemnity Agreement itself is silent as
to what assets Dr. Truland must pledge or make available for the
collateral requirement.  The Indemnity Agreement does not have

exclusions for either retirement account.  In the Second Amendment to the Indemnity Agreement, "[t]he obligations of Robert W. Truland shall be without any limitation or restriction set forth whatsoever, except" the exclusion of the marital home. (Daily Aff., Ex. C, at 3.)  Given that the Second Indemnity Agreement sets forth an unqualified pledge of all of Robert Truland's assets and listed only one exception to this pledge, the Court finds that Dr. Truland did pledge both of his retirement accounts.[16]

The Court must now turn to whether such a pledge was valid.  With respect to the 401(k) account, Dr. Truland contends that any pledge of that account is void because of the anti-alienation provision of the Employment Retirement Income Security Act ("ERISA").  (R. Truland Mem. in Supp. [Dkt. 156] at 9.)  Congress enacted ERISA, 29 U.S.C. § 1001 *et seq.*, to establish "a comprehensive federal scheme for the protection of pension plan participants and their beneficiaries."  *Smith v. Mirman*, 749 F.2d 181, 183 (4th Cir. 1981) (citations and internal quotation marks omitted).  Its "most important purpose" is to "assure American workers that they may look forward with anticipation to a retirement with financial security and

---

[16] Given the unqualified language of the Second Indemnity Agreement, the Court's finding that Dr. Truland pledged the retirement accounts does not depend on the validity of the 2011 Revised Financial Statement.

28

dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society." *Id.* (citations and internal quotation marks omitted). Among the provisions designed to "further ensure that the employee's accrued benefits are actually available for retirement purposes" is the requirement that *benefits* may not be assigned or alienated. *Id.* (citations and internal quotation marks omitted) (emphasis added).

ERISA's anti-alienation statute prevents a transfer of benefits provided under the plan. 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated."). This language contemplates that creditors may not garnish benefit payments to satisfy debts. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund, Fund et al.*, 493 U.S. 365, 371 (1990) (stating ERISA's anti-alienation provision applies to garnishment and holding constructive trust of benefit payments violated ERISA's prohibition on assignment or alienation of pension benefits). It says nothing about whether an individual may make a constructive withdrawal of funds by pledging the entire account as collateral before the account begins to pay retirement benefits.

Section 72(p) of Title 26 states that "[i]f . . . a participant or beneficiary assigns (or agrees to assign) or

pledges (or agrees to pledge) any portion of his interest in a qualified employer plan, such portion shall be treated as having been received by such individual as a loan from such plan." 26 U.S.C. § 72(p)(1)(B). Loans from plans are treated as distributions from that plan. 26 U.S.C. § 72(p)(1)(A). A qualified employer plan is defined as a plan listed in 26 U.S.C. § 401(a). 26 U.S.C. § 72(p)(4)(A)(i)(I).[17] Therefore, the 401(k) plan at issue here can be pledged, and such a pledge is effectively a distribution of the funds in the account. Thus, Dr. Truland's pledge of his 401(k) account was valid.

As to the 408(b) account, in 2012 Dr. Truland rolled over money from his 401(k) account and opened a 408(b) annuity account with Allianz Life Insurance Company of North America. (R. Truland Mem. in Supp. at 9.) Dr. Truland argues that federal and state law prohibit him from transferring any interest in the account. (*Id.*)

Under 26 U.S.C. § 408(e)(4), "[i]f, during any taxable year of the individual for whose benefit an individual retirement account ["IRA"] is established, that individual uses the account or any portion thereof as security for a loan, the

_____

[17] Section 401(k) states that such a cash or deferred arrangement "shall not be considered as not satisfying the requirements of subsection (a) merely because the plan includes a qualified cash or deferred arrangement." 26 U.S.C. § 401(k)(1). This language suggests that as a general rule, 401(k) plans are meant to be treated as satisfying the requirements under § 401(a).

portion so used is treated as distributed to that individual." This "clear language" means that "a pledge of funds in an IRA constitutes a distribution of funds to the individual." *In re Roberts*, 326 B.R. 424, 426 (S.D. Ohio 2004). Thus, a taxable event has occurred and the account is no longer protected under the bankruptcy code. *Id.* "This outcome is consistent with the general policy behind the exemption of an IRA, i.e., to protect a debtor's future income stream upon retirement." *Id.* Thus, "a debtor's pledge of his IRA as collateral for a loan, especially a business loan, is inconsistent with the need to protect that money as a future income stream for the debtor as against the debtor's creditors." *Id.* Therefore, under federal law Dr. Truland's pledge of his 408(b) account is valid.

Dr. Truland also cites to Maryland law in support of his argument that his 408(b) account is exempt from a judgment against Dr. Truland. Assuming, without deciding, that Dr. Truland may claim exemptions under Maryland law, the pledge of the account is still valid. Maryland law exempts from a judgment creditor

> any money or other assets payable to a participant or beneficiary from, or any interest of any participant or beneficiary in, a retirement plan qualified under § 401(a), § 403(a), § 403(b), § 408, § 408A, § 414(d), or § 414(e) of the United States Internal Revenue Code of 1986, as amended, or § 409 (as in effect prior to January

> 1984) of the United States Internal Revenue
> Code of 1954, as amended[.]

Md. Code Ann, Cts. & Jud. Proc. § 11-504(h)(1).

In support of his contention that §11-504(h)(1) applies, Dr. Truland cites to *In re Gibson*. That citation is inapposite. *Gibson* concerned "whether funds withdrawn from a qualified retirement plan are entitled to exemption status when not rolled into another qualified retirement plan until after the filing date of a bankruptcy petition." 300 B.R. 866, 868-69 (Bankr. D. Md. 2013). In considering whether the withdrawal of funds from an annuity account still kept their tax-exempt status and thus were immune from bankruptcy proceedings under § 11-504(h)(1),[18] the court looked "to the treatment of the property outside the bankruptcy proceeding." *Id.; see In re Mueller*, 256 B.R. 445, 451 (Bankr. D. Md. 2000) ("To be exempt from the claims of creditors in bankruptcy, assets must be exempt from the claims of creditors outside of bankruptcy.") Applying *Gibson*'s methodology, then, pledging the 408(b) account as collateral counts as a distribution of funds in the account under the Internal Revenue Code. Therefore, it would be a taxable event and would exclude the account from bankruptcy protection. *See Gibson*, 300 B.R. at 870 ("The Maryland

---

[18] Maryland has opted out of the federal bankruptcy exemptions. Debtors in Maryland may only claim exemptions under § 11-504. *In re Gibson*, 300 B.R. 866, 869 (Bankr. D. Md. 2003)

legislature has expressed a similar desire to protect an individual's retirement interest by extending the protection available to IRAs under the Internal Revenue Code to IRAs in bankruptcy."). Because pledging the 408(b) account is a distribution that triggers a taxable event and removes the plan from favorable tax treatment under 26 U.S.C. § 408, there is no protection for the 408(b) account under § 11-504. Thus, Dr. Truland's pledge of his 408(b) account is also valid.

Finally, Dr. Truland argues that the terms of the contract with Allianz prevent him from pledging his account. The Individual Retirement Annuity Endorsement (the "Endorsement") for the 408(b) annuity provides: "The policy is not transferable by the Owner and is for the exclusive benefit of the Owner and Beneficiary. The entire interest of the Owner is nonforfeitable." (R. Truland Mem. in Supp. at 5.) In pledging the funds, however, Dr. Truland has made a constructive withdrawal. *See* 26 U.S.C. § 408(e)(4). Therefore, Dr. Truland has not assigned his interest in the plan, and this provision has no effect on the Court's ruling.

### b. Mrs. Truland's Interest in Belgarde, Truland Partners, and Truland Holdings

Mrs. Truland claims that her interests in Belgarde, Truland Partners, and Truland Holdings are part of her sole and separate estate. (M. Truland Decl. [Dkt. 161] ¶ 19.)

At the time of its organization in 2000, Truland Partners, a limited liability company, issued twenty percent of its original membership interests to Mrs. Truland individually for $1,000.00. (M. Truland Decl. ¶¶ 23-24, 28.) Her membership interest was not received from Dr. Truland and was never held jointly with Dr. Truland. (*Id.* ¶¶ 30-34.) In 2009, Mrs. Truland transferred her interest in Truland Partners to the Mary W. Truland Revocable Inter Vivos Trust. (*Id.* ¶ 37.) In support of her declaration, Mrs. Truland attached the Deed of Trust effectuating that transfer. (M. Truland Decl., Exhibit M.) She also attached Truland Partners' ownership schedule and her partnership taxation forms ("Schedule K-1" or "K-1") for the years 2011, 2012, and 2013. (M. Truland Decl., Ex. L.)

Belgarde was organized in 2009 and is a Virginia limited liability company. (M. Truland Decl. ¶ 39.) At the time of its organization, Belgarde issued 2.7857 percent of its original membership interest to Mary Truland individually for $287.57. (M. Truland Decl. ¶¶ 41-42.) Mrs. Truland's membership interest has never been held jointly with Dr. Truland. (M. Truland Decl. ¶ 44.) Belgarde's ownership schedule and Mrs. Truland's K-1s for 2011, 2012, and 2013 are attached as Exhibit N to her declaration.

Truland Holdings was organized in 1999 and is a Virginia limited liability company. (M. Truland Decl. ¶¶ 50-

34

51.)  At the time of its organization, Truland Holdings issued

thirty percent of its original membership interests to Mrs.

Truland in exchange for $75,000.00.  (*Id.* ¶¶ 52-53.)  Her

interest in Truland Holdings has never been held jointly with

Dr. Truland and she did not receive her membership interest from

Dr. Truland.  (*Id.* ¶¶ 54-55.)  In 2009, she transferred her

membership interest to her revocable trust.  (*Id.* ¶ 61.)

Truland Holdings' ownership schedule, Mrs. Truland's K-1s, and

the deed of trust are attached to her declaration as Exhibits O

and P.

Plaintiffs argue that these three interests are not

part of Mrs. Truland's sole and separate estate because Mrs.

Truland has not put forth any evidence that the funds used to

purchase the membership interests were not drawn from a joint

account.  (Pls.' Opp. to M. Truland's Mot. [Dkt. 184] at 20-21.)

Additionally, Plaintiffs argue that Truland Partners and Truland

Holdings are "jointly held" with Dr. Truland because both

Trulands are trustees of Mrs. Truland's revocable trust.  (*Id.*)

The phrase "sole and separate estate" is not defined

in the Indemnity Agreement.  From the Court's perspective, it

has one of two meanings: property that is titled in Mrs.

Truland's name only or property that Mrs. Truland acquired using

funds constituting her separate property under the relevant

domestic relations law.  The Indemnity Agreement states that

35

"the liability and obligation's [sic] of Mary Truland hereunder shall only extend to and be enforceable against those assets jointly held by the Individual Indemnitors, and to any and all property she has received or may hereafter receive from Robert Truland and shall not extend and be enforceable against her sole and separate estate." (Daily Aff., Ex. A, at 12.) Reading this language to give effect to every word, the Court believes the phrase "sole and separate estate" was intended to refer to assets based on title, not by source of funds. *See Amchem Prods., Inc. v. Newport News Circuit Court Asbestos Cases*, 563 S.E.2d 739, 743 (Va. 2002) ("The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that parties intended what the written instrument plainly declares."); *see also Bala*, 2014 WL 1281235, *3 ("Thus, the parties' intent should be discerned solely from the four corners of the agreement.")

First, the indemnity obligation extends to assets "jointly held." This contemplates designating assets by title, which results in three categories of assets: assets owned by both Dr. and Mrs. Truland, assets owned by Dr. Truland, and assets owned by Mrs. Truland. Given that all of Dr. Truland's assets are subject to the indemnity obligation, Dr. Truland could transfer all of his individual assets to Mrs. Truland,

36

thereby putting his assets beyond the reach of the indemnity
obligation.  However, the inclusion of "any and all property she
has received or may hereafter receive from Robert Truland"
forecloses such a result.  Thus, the Indemnity Agreement freezes
the Trulands' asset structure as it existed on July 26, 2011:
assets owned by Dr. Truland and assets owned by Dr. and Mrs.
Truland, which are subject to the indemnity obligation, and
assets owned by Mrs. Truland, which are not.  Since Mrs. Truland
acquired her separate interests in Belgarde, Truland Holdings,
and Truland Partners before signing the Indemnity Agreement in
2011, these assets are part of her sole and separate estate and
are not subject to the indemnity obligation.

Plaintiffs contend that Truland Holdings and Truland
Partners are jointly owned because both Trulands are trustees of
Mrs. Truland's revocable trust.  (Pls.' Opp. at 20.)  Plaintiffs
cite to *Higdon v. Lincoln Nat'l Ins. Co.* for the proposition
that "[t]he trustee is in substance the 'owner' of the trust
property, as far as third persons are concerned."  No. CIV.A.-
ELH-13-2152, 2014 WL 1630210, at *4 (D. Md. Apr. 21, 2014).
While the quotation is correct, the principle for which it is
cited is not.  The question in *Higdon* was whether a beneficiary
of a trust has standing to sue on a contract right held by the
trust.  *Id.*  The quotation cited by Plaintiffs was used to
explain the general rule that the right to bring an action on

37

behalf of the trust against a third party belongs to the trustee
because "[t]he trustee is in substance the 'owner' of the trust
property, as far as third persons are concerned." *Id.* (citation
and internal quotation marks omitted).  However, this does not
mean the trustee owns the property as his own.  The trustee acts
on behalf of the beneficiaries.  Personal creditors of the
trustee cannot reach the trust's assets. *See In re Bilter*, 413
B.R. 290, 305 (Bankr. E.D. Va. 2009) (stating that all that is
necessary to create an express trust is "that the legal estate
[be] vested in one person, to be held in some manner or for some
purpose on behalf of another.").  Therefore, Dr. Truland cannot
be considered a co-owner of property in Mrs. Truland's revocable
trust.  Furthermore, according to the trust documents, only Mrs.
Truland as the grantor has power to direct the trustees as to
how to manage the property.  (M. Truland's Mem. in Supp., Ex.
J.)  Though the interests are held in trust, they are still
subject to Mrs. Truland's exclusive control.  Accordingly,
Truland Holdings and Truland Partners are part of Mrs. Truland's
sole and separate estate.

### c. The Scope of the Marital Home Exemption

The Trulands maintain that their marital home is a
106-acre plot known as "Ithaca Farm," and all of this property
is exempt from the indemnity obligation.  (M. Truland's Opp. at
27.)  Plaintiffs argue that the only exempt property is 15800

38

Darnestown Rd., Germantown, Maryland, a much smaller subset of
Ithaca Farms. (Pls.' Opp. to M. Truland [Dkt. 184] at 23.) The
Indemnity Agreement states that "The **SURETY** hereby covenants and
agrees that the liability and obligation's [sic] of the
Individual Indemnitors shall not extend to and be enforceable
against the home of the Individual Indemnitors located at 15800
Darnestown Rd., Germantown, Va. [sic][19] 20874." (Daily Aff., Ex.
A, at 12.) Subsequent amendments to the Indemnity Agreement
retained this language.

        The Trulands have submitted two deeds. The first deed
is dated September 10, 2009 and transfers Dr. and Mrs. Truland's
fee simple interest in 15800 Darnestown Road to the Trulands'
revocable trusts. (Mary Truland Decl., Ex. C, at 1.) The
second deed is dated September 25, 2009 and transfers Dr. and
Mrs. Truland's fee simple interest in 15330 Darnestown Road to
the same revocable trusts. (M. Truland Decl., Ex. D, at 1.) In
the State of Maryland Land Instrument intake sheet attached to
the 15800 Darnestown Road deed, the property is listed as
residential and as the grantees' (Dr. and Mrs. Truland's)
principal residence. (M. Truland Decl., Ex. C, at 8.) In the
instrument intake sheet attached to the 15330 Darnestown Road
deed, the property is listed as non-residential and not as the

---

[19] Though the original Indemnity Agreement lists the address as
located in Virginia, it is actually in Maryland.

grantees' principal residence.  (M. Truland Decl., Ex. D, at 9.)
The parcels, according to the intake sheet, have different tax
identification numbers.  And as best the Court can tell from the
legal description of the land, the deeds represent two separate
yet adjacent parcels.  In light of this and the contractual
language exempting the "home" of Dr. and Mrs. Truland located at
15800 Darnestown Road, the Court finds that the parcel of
property identified in Exhibit D to Mary Truland's declaration
as at 15330 Darnestown Road is subject to the Trulands'
indemnity obligation.

   The Trulands cite the appraisal report done for JP
Morgan as evidence that the two parcels of land both constitute
15800 Darnestown Road.  (M. Truland's Decl., Ex. E.)  While
practically the Trulands may hold out both parcels as part of
one united homestead, legally the parcels are separate.  The
Court is bound to enforce the plain meaning of the Indemnity
Agreement, which exempts only the property at 15800 Darnestown
Road, not "Ithaca Farm," which is both 15800 Darnestown Road AND
15330 Darnestown Road.  Therefore, the only part of "Ithaca
Farm" that is exempt from the Trulands' indemnity obligation is
the parcel of land identified in the deed in Exhibit C to Mary
Truland's declaration as 15800 Darnestown Road.

   **d. Park Potomac Condominiums (Investor) 1 and 2**

40

While the Trulands state that their interests in Park Potomac Condominiums (Investor) 1 and 2 are joint, they argue that their interests cannot be pledged because of the anti-hypothecation provisions in the operating agreements.  (M. Truland's Mem. in Supp. at 12-13.)  Plaintiffs claim that the Trulands are free to transfer their interests under the operating agreements because such a transfer only requires the approval of Dr. Truland.  (Pls.' Opp. to M. Truland's Mot. at 24-25.)

Section 9.4 of the Parc Potomac (Investor) 1 and 2 operating agreements[20] states that "[a]ny hypothecation, mortgage, pledge or collateralization of a Membership Interest is expressly prohibited, and any such purported hypothecation, mortgage, pledge or collateralization in any manner by any person shall be null and void and of no legal consequence."  (M. Truland Decl., Exs. R & S, at 19.)  Thus, the Trulands cannot pledge their membership interests in Park Potomac (Investor) 1 and 2 as collateral.

However, this prohibition on using the interests as collateral does not mean that the Trulands cannot sell or transfer the interests.  Section 9.1 states "[u]nless otherwise permitted in this Section 9, no Member may assign, transfer,

---

[20] The operating agreements for both Park Potomac (Investor) 1 and 2 appear to be the same.

sell or otherwise dispose of its Membership Interest,[21] or any portion thereof, except with the consent of the Manager and only after complying with the provisions of Section 9.3 hereof." (*Id.*)  "'Manager' shall initially mean Robert W. Truland, and subsequently any person who (i) has become a Manager pursuant to the terms of this Agreement, and (ii) has not ceased to be a Manager pursuant to the terms of this Agreement." (*Id.* at 6.) Thus, it is within Dr. Truland's power to authorize a sale or transfer of a membership interest, provided that the sale or transfer complies with the registration requirements of Section 9.3.[22]   Additionally, the operating agreements contemplate that such sales or transfers will take place, as other sections govern the rights of the assignee (Section 9.6), whether the transferee is qualified to become a member (Section 9.7), and how to distribute profits and losses when a membership interest has been transferred (Section 9.8). (*Id.* at 20.) Therefore, in

---

[21] "'Membership Interest' means an ownership interest in the Company corresponding to a Percentage Interest to which the interest relates and includes any and all benefits to which the holder of such a Membership Interest may be entitled as provided in this Agreement, together with all obligations of such Person to comply with the terms and provisions of this Agreement." (M. Truland Decl., Exs. R & S, at 6.)  Exhibit A to the operating agreements state that the Trulands have a ten percent interest in each company. (*Id.* at 27.)

[22] The Trulands have not shown that there are other managers under the operating agreements.  The Court assumes Dr. Truland is the only manager and thus the only person whose permission is necessary to effectuate a transfer of the Trulands' membership interests.

order to satisfy the judgment, the Trulands must transfer their
membership interests in Park Potomac Condominiums (Investor) 1
and 2 to Plaintiffs.

### e. Other Assets

The Court entered a preliminary injunction covering
certain assets.  Now that there has been a final determination
of liability, the art and the funds in escrow shall be released
to Plaintiffs.  Furthermore, since there is no dispute that RWT
I, LLC is a joint asset (*see* M. Truland Decl. ¶¶63-69), it is
also subject to the indemnity obligation.

### B. Fraud Counts

Plaintiffs have brought four claims for fraud.  Two of
the claims relate to the purported fraudulent inducement to
enter into the Indemnity Agreement in 2011 and center on the
alleged 2011 financial statement.  The remaining two counts
involve inducement to continue the bonding relationship and
focus on the alleged 2013 financial statement.  The Trulands
contest the validity of these financial statements, in
particular Mrs. Truland, who argues that she was not aware of
the existence of these financial statements until this
litigation commenced.[23]  (M. Truland Decl. ¶¶ 97-101.)

---

[23]The Court notes that this litigation position is at odds with
what is already in evidence.  The 2011 and 2013 financial
statements were admitted into evidence at the first preliminary

In light of the Court's holding regarding Dr. Truland's retirement accounts and Park Potomac Condominiums (Investor) 1 and 2, the only assets which could be the subject of a fraud action are Mrs. Truland's separate interests in Belgarde, Truland Partners, and Truland Holdings.  Therefore, the Court's inquiry will focus on these three assets.

The elements of fraud in the inducement are (1) false representation of material fact; (2) reliance; and (3) inducement to enter the contract.  *Abi-Najm v. Concord Condo.*, 699 S.E.2d 483, 489 (Va. 2010).  As to two of the assets, Truland Partners and Truland Holdings, the fraud claims must fail.  These assets appear nowhere in the 2011 or 2013 financial statements, and neither party has pointed the Court to where they are located on the financial statements.  Since the assets are not listed, there is no way that Plaintiffs could have relied on the value of these assets in agreeing to enter into the bonding relationship.

This leaves Belgarde as the lone asset that may have been fraudulently misrepresented.  On the 2011 financial statement, Belgarde is listed as having a valuation of $16 million.  (Pls.' Mem. in Supp., Ex. 5, at 3.)  The Trulands had an $800,000.00 investment in the property, *all* of which is

_____

injunction hearing in October 2014 without any objection from Robert or Mary Truland.  (10/30/14 TRO Hr'g [Dkt. 47].)

listed as joint.  (*Id.*)  The 2013 financial statement lists the
Trulands as having a $758,400.00 investment in Belgarde, of
which the Trulands each have half ($379,200.00).  (10/30/14 TRO
Hr'g [Dkt. 47], Ex. 4.)  Summary judgment for the Trulands is
appropriate on Counts VI and VII, the counts arising from the
2013 financial statement, because there was no misrepresentation
about Mrs. Truland's separate interest in Belgarde on that
statement.  Thus, the fraud inquiry centers on whether the 2011
representation that Belgarde was a joint interest constitutes
actionable fraud.

    Mrs. Truland previously moved to dismiss the fraud
counts on grounds that Plaintiffs were barred by the statute of
limitations.  As this is an affirmative defense, the Court
declined to entertain that argument at the motion to dismiss
stage.  (3/3/15 Mem. Op. [Dkt. 145] at 14-15.)  Mrs. Truland
appropriately renews this argument in her motion for summary
judgment.

    The statute of limitations for fraud actions in
Virginia is two years "after the cause of action accrues."  Va.
Code Ann. § 8.01-243(A).  The cause of action does not accrue
until such fraud is discovered "or by the exercise of due
diligence reasonably should have been discovered."  Va. Code
Ann. § 8.01-249(1).  Ultimately, the burden is on the plaintiff
to "prove that, despite the exercise of due diligence, he could

45

not have discovered the alleged fraud except within the two-year period before he commenced the action." *Dunlap v. Texas Guaranteed*, 590 F. App'x 244, 244 (4th Cir. 2015) (citing *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 839 (Va. 2008)).

The Supreme Court of Virginia has interpreted the due diligence requirement in § 8.01-249 as "such a measure of prudence activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case." *STB Marketing Corp. v. Zolfaghari*, 393 S.E.2d 394, 397 (Va. 1990) (citations and internal quotation marks omitted). Such a determination is fact-specific to each case. *Id.*

Mrs. Truland argues that the statute of limitations began to run at some point in 2011, either before the Indemnity Agreement was signed or soon thereafter in the fall when Plaintiffs began to have "major concerns" about the financial condition of the Truland Entities. (M. Truland's Mem. in Supp. at 13.) At the latest, Mrs. Truland argues that Plaintiffs should have been aware of the alleged fraud by October 16, 2012, the date the Truland Entities received notice of default in connection with the Utah Data Center project, one of the Truland

Entities' biggest jobs.  (*Id.* at 13-14.)  Both contentions must
be rejected.

Mrs. Truland's first argument is premised on the idea
that Plaintiffs had a duty to verify the assets were as the
Trulands allegedly stated on the financial statement.  While
this may have been a prudent business practice, Plaintiffs had
no such duty.  In fact, it was the Trulands who had a common law
duty to provide accurate information about their ability to
perform under the contract, which in this case meant the
Trulands had to present an accurate representation of assets
available to satisfy the their indemnity obligation.  *See
Nystrom v. Servus Robots, LLC*, No. LF-1517-3, 2000 WL 249246, at
*3 (Va. Cir. Ct. Mar. 2, 2000) ("[Defendant] clearly would have
a common law duty not to defraud and mislead [plaintiff] at the
time of formation about [defendant's] intentions to perform
under the alleged contract.  A contrary finding would extinguish
actions for fraud in the inducement of contracts.").

Mrs. Truland's second argument does not put this suit
outside of the reach of the statute of limitations.  Learning
that the Truland Entities defaulted on a large project could
not, in and of itself, have put Plaintiffs on notice that
representations about Mrs. Truland's interest in Belgarde were
misrepresented on the 2011 financial statement.  To be sure, it
appears that as a consequence of that default, Plaintiffs

required that the Indemnity Agreement be revised to remove any cap on the Trulands' individual liability and that as part of the revision, Plaintiffs requested the 2013 financial statement from the Trulands.  (M. Truland's Mem. in Supp., Ex. 3, at 172, 194-95.)  But the mere fact of default would not have been a reasonable basis to question the representations in the 2011 statement.  Furthermore, the point is academic, as this suit was filed on August 20, 2014, within two years of the October 16, 2012 default.[24]

Nonetheless, summary judgment for Mrs. Truland is appropriate on Counts IV and V as well because the misrepresentation of her separate interest in Belgarde is not material.  Had the Trulands[25] correctly labeled Mrs. Truland's separate interest in Belgarde, the 2011 financial statement would have reflected $400,000.00 less that would have been available to satisfy the indemnity obligation.  This means that

---

[24] The amended complaint "relates back" to the original filing date, since the addition of the fraud counts "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading[.]"  Fed. R. Civ. P. 15(c)(1)(B).

[25] Mrs. Truland argues that she cannot be liable for fraud because she never directly participated in the preparation of both financial statements and was unaware of their existence until this litigation.  (M. Truland Decl. ¶¶ 97 -101.)  She also challenges Plaintiffs' assertion that there was an actual or apparent agency relationship between her and her husband in relation to the preparation of the financial statements.  (M. Truland Opp. at 30.)  In light of the Court's finding that the misrepresentation is not material, it is not necessary to reach the agency issue.

instead of having $91,079,600.00 available to indemnify
Plaintiffs (the sum of the "RWT Individual" and the "Joint"
columns), Plaintiffs would have seen that there was only
$90,679,600.00 available.  Put another way, the Trulands
misstated their assets by less than one percent.  Considering
the contract involved several million dollars and Plaintiffs are
sophisticated construction sureties, such a minute difference
could not have been material to Plaintiffs' decision to enter
into a bonding relationship.  *See In re Batromeli*, 303 B.R. 254,
273-74 (Bankr. D. Conn. 2004) (finding that debtor's
misstatement of personal assets by eight percent on a personal
financial statement submitted to surety was not a "material
falsity" within the meaning of the Bankruptcy Code).

### C. Fraudulent/Voluntary Conveyance

The Trulands move for summary judgment on the
fraudulent/voluntary conveyance count.  Plaintiffs allege that
on or about December 27, 2012, after the Indemnity Agreement and
First Amendment were signed but just before the Second Amendment
was signed, Dr. Truland created a new irrevocable trust known as
the Truland 2012 Family Generation Trust ("2012 Family Trust").
(Am. Compl. ¶ 62.)  Mrs. Truland is the trustee and the
Trulands' four children are the beneficiaries of the trust.
(*Id.*)  Dr. Truland transferred a $4.5 million interest in

49

Truland Partners to the 2012 Family Trust without consideration.

(*Id.* ¶ 63.)

> Virginia's fraudulent conveyance statute states:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal . . . with intent to delay, hinder, or defraud creditors, purchasers, or other persons of or from that they are or may be lawfully entitled to shall, as to such creditors, purchasers, or other persons, their representatives or assignees be voided.   This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of the granter.

Va. Code § 55-80.  Because of the difficulty of establishing "actual intent," evidence of fraud is generally circumstantial. *In re Porter*, 37 B.R. 56, 63 (Bankr. E.D. Va. 1984).  Courts have relied on badges of fraud, which consist of facts and circumstances which the law admits to be signs of fraud and from which the fraudulent intent may be inferred.  *Id.*  Badges of fraud include:

> (1) retention of an interest in the transferred property by the transferor; (2) transfer between family members for allegedly antecedent debt; (3) pursuit of the transferor or threat of litigation by his creditors at the time of the transfer; (4) lack of or gross inadequacy of consideration for the conveyance; (5) retention or possession of the property by transferor; and (6) fraudulent incurrence of indebtedness after the conveyance.

*Id.* (citing *Hutcheson v. Savings Bank of Richmond*, 105 S.E 677, (Va. 1921)).

A party seeking to void a transfer establishes a *prima facie* case by demonstrating a badge of fraud. *Porter*, 37 B.R. at 63 (citing *Temple v. Jones, Son & Co.*, 19 S.E.2d 57, 62 (Va. 1942)). Plaintiffs here identify three badges of fraud: Dr. Truland's retention of an interest in the transferred property, the lack of consideration given for the transfer, and Dr. Truland's "fraudulently" incurred indebtedness after the transfer by signing the Second Amendment to the Indemnity Agreement. (Pls.' Opp. to M. Truland's Mot. at 32.) These badges are supported by the record. Article 3 of the trust, titled "Grantor Trust," allows Dr. Truland to reacquire trust assets by substituting other property of equivalent value and gives the trustee power to make loans to Dr. Truland without adequate security. (M. Truland Decl., Ex. T, at 2.) Article 4 of the trust provides that the income or principal shall not be used for Dr. Truland's benefit or to pay any legal obligation of Dr. Truland or the trustee. (*Id.* at 3.) Dr. Truland transferred the interest to the trust for no consideration.[26] (M. Truland Decl., Ex. U, at 1.) Finally, in December of 2012

---

[26] Since no consideration was given, the last sentence of § 55-80 does not apply and the Court need not consider whether Mrs. Truland, as trustee of the 2012 Family Trust, was aware of the alleged fraud.

talks were on-going with Plaintiffs about amending the Indemnity Agreement, which was done in January of 2013 and removed the cap on the Trulands' individual liability.  (M. Truland Mem. in Supp., Ex. B, Martha Gaines Dep., at 42 ("Q: Do you remember when, after July 26, 2011, when the next time was that XL requested a personal financial statement from the Trulands? A: It would have been towards the end of 2012.").)[27]

   "[W]here the transaction assailed is between . . . near relatives, only slight evidence is required to shift the burden of showing its bona fides." *Fowlkes v. Tucker*, 180 S.E. 302, 305 (Va. 1935).  Plaintiffs have established a prima facie case of fraudulent conveyance.  In order to succeed on their motion for summary judgment, the Trulands must put forth evidence that the transaction was legitimate.  Beyond the

---

[27] Gaines also testified about the circumstances surrounding the removal of the limitation on liability.

> Q: Could you tell me what precipitated the second amendment?
> A: Sure.  As a result of the financial results from The Truland Group – you know, when I say 'The Truland Group,' the Truland group of companies – as a result of the financial results and the claim on the Utah Data Center, and the condition of the corporate entities, we demanded, asked, requested that Mr. and Mrs. Truland provide unlimited personal indemnity for all bonds going forward.  That was a – you know, a condition of continued support as a result of the facts and circumstances of that time.

(M. Truland Mem. in Supp., Ex. B, Martha Gaines Dep., at 46-47.)

conclusory statement that they lacked the requisite fraudulent intent, the Trulands have put forward no evidence[28] to rebut the badges of fraud.  (M. Truland Mem. in Supp. at 14-16.)  As Plaintiffs have not moved for summary judgment on this count, the Court is forced to deny summary judgment to the Trulands and let this issue proceed to trial.

Though it is not pled in a count separate from the fraudulent conveyance, Plaintiffs also seek to set aside the transfer to the 2012 Family Trust on a theory of voluntary conveyance under Virginia Code § 55-81.[29]  To avoid a transfer pursuant to this provision, the party challenging the transfer must demonstrate "(1) a transfer was made, (2) the transfer was not supported by consideration deemed valuable in law, and (3)

---

[28] In Mrs. Truland's memorandum in support, she states the assignment was made at the advice of their estate advisor, John Dedon, an attorney.  (M. Truland Mem. in Supp. at 15.)  But at the time she filed her motion for summary judgment, Mrs. Truland did not have Dedon's declaration and did not seek leave of court to file the declaration out of time.  Therefore, the Court granted Plaintiffs' motion to strike Dedon's declaration as untimely.  (3/25/15 Order [Dkt. 175].)

[29] That statute states:

> Every gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, or which is upon consideration of marriage, by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made, but shall not, on that account merely, be void as to creditors whose debts shall have been contracted or as to purchasers who shall have purchased after it was made.

the transfer was done when the transferor was insolvent or the transfer rendered the transferor insolvent." *In re Meyer*, 244 F.3d 352, 353 (4th Cir. 2001).  Summary judgment for the Trulands is appropriate on this theory because Plaintiffs have not shown that Dr. Truland's transfer to the 2012 Family Trust was done at a time he was insolvent or that that the transfer made him insolvent.  Therefore, the lone issue for trial is whether Dr. Truland fraudulently conveyed an interest in Truland Partners to the 2012 Family Trust to put the interest beyond the reach of Plaintiffs.

### D. A & E Technologies

Plaintiffs move for summary judgment against A&E Technologies, a signatory to the Indemnity Agreement.  A summons was issued to A&E Technologies.  [Dkt. 5.]  However, there is no proof of service as to A&E Technologies.  *See* Fed. R. Civ. P. 4(*l*)(1) ("Unless service is waived, proof of service must be made to the court.").  A&E Technologies has not filed any answer or responsive pleading in this case.[30]

The appropriate procedural mechanism for getting a judgment against A&E Technologies is to move for default.  Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for

---

[30] Terry Bowman appeared on behalf of A&E Technologies at the TRO hearing on August 21, 2014.  [Dkt. 10.]  Mr. Bowman is not an attorney and did not make any further appearances before this Court.

affirmative relief is sought has failed to plead or otherwise
defend, and that failure is shown by affidavit or otherwise, the
clerk must enter the party's default."). Therefore, the Court
will deny Plaintiffs' motion for summary judgment against A&E
Technologies.

### IV. Conclusion

For the foregoing reasons, the Court will (1) grant
Plaintiffs' Motion for Summary Judgment; (2) deny Robert
Truland's Motion for Summary Judgment as to his retirement
accounts and Count IX; (3) grant Robert and Mary Truland's
Motions for Summary Judgment as to Counts IV, V, VI, and VII;
and (4) deny Mary Truland's Motion for Summary Judgment as to
Counts I, II, III, and IX. Plaintiffs' motion in limine to
exclude the expert report of Robert Morelewicz and Robert
Truland's motion in limine to exclude the expert opinion of Mary
Jeanne Anderson will be denied as moot. An appropriate order
will issue.

| | /s/ |
|---|---|
| May 11, 2015 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |